# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

DATA CARRIERS, LLC,

            Plaintiff,

vs.

NEWEGG INC.,

            Defendant.

NEWEGG INC.,

            Counterclaim Plaintiff,

vs.

DATA CARRIERS, LLC, and
IP NAVIGATION GROUP, LLC,

            Counterclaim Defendants.

Case No. 12-cv-000942-LPS

JURY TRIAL DEMANDED

## COUNTERCLAIM PLAINTIFF NEWEGG INC.'S COMBINED OPPOSITION TO COUNTERCLAIM DEFENDANTS DATA CARRIERS'S AND IP NAVIGATION GROUP'S MOTION TO DISMISS ABUSE OF PROCESS COUNTERCLAIM

PROCTOR HEYMAN LLP
Dominick T. Gattuso (# 3630)
E-mail: dgattuso@proctorheyman.com
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300

Attorneys for Newegg Inc.

OF COUNSEL:

THE WEBB LAW FIRM
Kent E. Baldauf, Jr.
E-mail: KBaldaufjr@webblaw.com
Bryan P. Clark
E-mail: BClark@webblaw.com
Daniel H. Brean
E-mail: DBrean@webblaw.com
One Gateway Center
420 Ft. Duquesne Boulevard, Suite 1200
Pittsburgh, PA 15222
(412) 471-8815

Dated: December 17, 2012

# TABLE OF CONTENTS

TABLE OF AUTHORITES………………………………………………………………....ii

I.    BACKGROUND .................................................................................................................. 1

  A.  NEWEGG AND THE *SFA* AND *TQP* LITIGATIONS.................................................................. 1

  B.  IP NAV, ERICH SPANGENBERG, AND DATA CARRIERS .......................................................... 2

  C.  THE JUNE 25, 2012 AUCTION PRESS RELEASE..................................................................... 4

  D.  IP NAV'S PRIOR *TAURUS IP* LITIGATION ............................................................................. 5

  E.  NEWEGG'S AND IP NAV'S POST-FILING DISCUSSIONS.......................................................... 7

II.   ARGUMENT...................................................................................................................... 8

  A.  ABUSE OF PROCESS LEGAL PRINCIPLES ................................................................................. 9

  B.  THE AGENCY RELATIONSHIP BETWEEN IP NAV AND DATA CARRIERS IS SUCH THAT THEY
  ARE JOINTLY AND SEVERALLY LIABLE FOR THE ABUSE OF PROCESS, AND ANY KNOWLEDGE AND
  IMPROPER INTENT ON THE PART OF IP NAV IS IMPUTED TO DATA CARRIERS ........................... 11

  C.  DATA CARRIERS HAS NO "ABSOLUTE RIGHT" TO FILE A PATENT INFRINGEMENT LAWSUIT
  WHERE THE LAWSUIT IS FILED AND WIELDED FOR IMPROPER COLLATERAL ADVANTAGES....... 14

  D.  NEWEGG HAS REQUESTED RELIEF AS TO IP NAV IN SATISFACTION OF RULE 8(A)(3)......... 19

  E.  AT A MINIMUM, DISCOVERY IS NECESSARY AND APPROPRIATE ON THE ABUSE OF PROCESS
  CLAIM ......................................................................................................................................... 20

III.  CONCLUSION................................................................................................................. 20

# TABLE OF AUTHORITIES

## I.    CASES

*Am. Int'l Group, Inc. v. Greenberg*, 965 A.2d 763 (Del. Ch. 2009)............................................ 12

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................................... 8

*Bayer AG v. Sony Elecs., Inc.* 229 F. Supp. 2d 332 (D. Del. 2002)................................... 14, 15, 18

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)..................................................................... 8

*Bull v. McCuskey*, 615 P.2d 957 (Nev. 1980)......................................................................... 11, 19

*Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314 (Fed. Cir. 2011) ............................................. 11

*Feinman v. Bank of Delaware*, 728 F. Supp. 1105 (D. Del. 1990)............................................ 9, 10

*GN Netcom, Inc. v. Callpod, Inc.*, 2012 U.S. Dist. LEXIS 132001, No. 11-cv-03271-RBJ,
    at *5 (D. Colo. Sept. 17, 2012) ................................................................................................. 9

*ING Bank, FSB v. American Reporting Co., LLC*, 843 F. Supp. 2d 491 (D. Del. 2012).............. 11

*KE Property Management, Inc. v. 275 Madison Management Corp.*, No. 12683, 1993 Del. Ch.
    LEXIS 147 (Del. Ch. 1993) ..................................................................................................... 12

*Lang v. Koziarz*, No. 1120-SUSSEX, 1989 Del. Ch. LEXIS 44 (Del. Ch. May 2, 1989)............ 12

*Meyer v. Holley*, 537 U.S. 280 (2003) ................................................................................... 11, 12

*Neitzke v. Williams*, 490 U.S. 319 (1989)...................................................................................... 8

*Netgear, Inc. v. Ruckus Wireless, Inc.*, 852 F. Supp. 2d 470 (D. Del. 2012).................................. 8

*Nix v. Sawyer*, 466 A.2d 407 (Del. Super. Ct. 1983)........................................................ 9, 10, 19

*New Orleans, M., & C.R. Co. v. Hanning*, 82 U.S. 649 (1872)..................................................... 12

*RRR Farms, LTD v. Am. Horse Protection Ass'n, Inc.*, 957 S.W.2d 121 (Tex. App. 1997)........ 15

*Spence v. Spence*, No. K11C-06-035, 2012 Del. Super. LEXIS 188 (Del. Super. Ct. April 20,
    2012).......................................................................................................................................... 15

*ST Sales Tech Holdings, LLC v. Daimler Chrysler Co., LLC*, No. 6:07-cv-00346-LED-LJD, 2008
    U.S. Dist. LEXIS 107096 (E.D. Tex. March 14, 2008) ........................................................... 16

*STMicroelectronics N.V. v. Agere Sys.,* No. 08C-09-099, 2009 Del. Super. LEXIS 184 (Del. Super. Ct. May 19, 2009) .................................................................................................... 9, 10, 20

*Taurus IP, LLC v. DaimlerChrysler Corp.,* 559 F. Supp. 2d 947 (W.D. Wis. 2008)............ 5, 6, 16

*Toll Bros., Inc. v. General Acc. Ins. Co.,* 1999 (Del. Super. Ct. August 4, 1999)........................ 10

*Tomka v. Seiler Corp.,* 66 F3d 129 (2d Cir. 1995). ...................................................................... 12

*TruePosition, Inc. v. Allen Telecom,* 2003 U.S. Dist. LEXIS 881 (D. Del. Jan. 21, 2003).......... 13

*Tyler v. Corner Const. Corp.,* 167 F.3d 1202 (8th Cir. 1999)................................................. 10, 11

*Vechery v. Hartford Accident & Indemnity Ins. Co.,* 121 A.2d 681 (Del. 1956) ......................... 12

*Wooleyhan v. Cape Henlopen Bd. of Educ.,* No. 10-0153, 2010 U.S. Dist. LEXIS 65060 (D. Del. June 28, 2010) .............................................................................................................................. 13

*Wyss v. General Dynamics Corp.,* 24 F. Supp.2d 202 (D.R.I. 1998) ........................................... 12

## II.    STATUTES

35 U.S.C. § 285.............................................................................................................................. 19

## III.    OTHER AUTHORITIES

Restatement (Second) of Torts § 682 (1977)............................................................................. 9, 10

## IV.    RULES

Fed. R. Civ. P. 12(b)(6)................................................................................................................... 1

Counterclaim Plaintiff Newegg Inc. ("Newegg") hereby opposes Counterclaim Defendant IP Navigation Group, LLC's ("IP Nav") motion to dismiss Newegg's abuse of process counterclaim (D.I. 21, supporting brief at D.I. 22, hereinafter "IP Nav Br."). Because the issues are largely identical, Newegg also hereby opposes Counterclaim Defendant Data Carriers, LLC's ("Data Carriers") motion to dismiss Newegg's abuse of process counterclaim (D.I. 23, supporting brief at D.I. 24, hereinafter "Data Carriers Br.").

IP Nav has taken the position that Newegg has not adequately pleaded its abuse of process counterclaim because IP Nav is merely Data Carriers' agent and not the plaintiff in the patent infringement action. IP Nav Br. at 1. Data Carriers has taken the position that Newegg's abuse of process claim is insufficient because Data Carriers has an "absolute right to file suit to enforce" its patent. Data Carriers Br. at 4. Both IP Nav and Data Carriers are wrong on these points and their motions should be denied in full. Newegg's abuse of process claim is fully supported by law and has been properly pleaded in satisfaction of Rule 12(b)(6). *See generally* Newegg's First Amended Answer and Counterclaim, at Count III and the attachments thereto (D.I. 20, at pages 9-23, hereinafter "Amended Counterclaim").

## I.  Background

### A.  Newegg and the *SFA* and *TQP* Litigations

Newegg is an online retailer that is in the business of selling products such as consumer electronics, components, and accessories via Newegg's website: www.newegg.com. Newegg's success has caused it to be a target for lawsuits by various patent owners, each claiming to have the exclusive right to one or more features that Newegg's website performs or utilizes, and seeking a percentage of Newegg's profits as alleged damages. Amended Counterclaim, ¶ 30. Two such lawsuits are: (1) *SFA Systems, LLC v. 1-800 Flowers.com, Inc. et al.*, No. 6:09-cv-

1

00340-LED (E.D. Tex., Complaint filed July 28, 2009) (consolidated with *SFA Systems, LLC v. Barnes & Noble, Inc. et al.*, No. 6:11-cv-00399-LED (E.D. Tex., Complaint Filed August 1, 2011)); and (2) *TQP Development, LLC v. 1-800 Flowers.com, Inc. et al.*, No. 2:11-cv-00248-MHS-CMC (E.D. Tex., Complaint filed May 6, 2011). *Id.* ¶ 23. These two lawsuits are exceedingly complex, and are disproportionately costly and burdensome to defend. *Id.* ¶ 28. Newegg contends that SFA and TQP make and sell no products or services, but exist solely for the purpose of acquiring and owning patents to monetize them, particularly by suing companies for infringement in hopes of securing a monetary settlement license or judgment. *Id.* ¶¶ 21, 24.

Prior to being sued by SFA Systems, LLC ("SFA") and TQP Development, LLC ("TQP"), Newegg had no knowledge of these plaintiffs or their respective patents because neither SFA nor TQP communicated with Newegg before bringing suit. *Id.* ¶ 29. IP Nav, purporting to act as SFA's and TQP's agent, post-filing offered a license to Newegg to settle the SFA and TQP matters, in one instance offering to "bundle" the settlement of both cases together. *Id.* ¶ 29. Newegg has declined to accept IP Nav's terms for settlement. *Id.*

### B. IP Nav, Erich Spangenberg, and Data Carriers

IP Nav is a "patent monetization" firm that works with and for various patent holding companies. Amended Counterclaim, at ¶ 21. IP Nav exists primarily to assert those companies' patents in litigation in attempt to secure favorable monetary settlements or judgments. *Id.* Erich Spangenberg is the Chairman of IP Nav and David Pridham is the Chief Executive Officer of IP Nav. *Id.* Erich Spangenberg has advocated his trademark "sue first, ask questions later" policy when it comes to asserting patents. *Id.* ¶ 22. He opts to sue in venues where the largest verdicts are likely to be obtained, even if the likelihood of prevailing on the merits is higher elsewhere. *Id.*

2

SFA and TQP are companies created and owned directly and indirectly by Erich Spangenberg, IP Nav's principal, as well as Erich Spangenberg's wife and child, Audrey and Christian Spangenberg. *Id.* ¶¶ 25-26. The Spangenberg family owns many other such patent holding companies that assert their patents in litigation and obtain settlements with the help of IP Nav. *Id.* ¶¶ 27, 48-50.

Data Carriers is a Delaware LLC that purports to own the patent-in-suit. (Complaint, D.I. 1, at ¶¶ 1, 6, hereinafter "Complaint"). Prior to the filing of the complaint on July 19, 2012, Newegg had never heard of Data Carriers or its asserted patent. Amended Counterclaim, at ¶ 37. No attempt was made to communicate with Newegg about its website to determine whether the back-end functionality of its website, which is not apparent from publicly available information, in fact satisfied all of the limitations of the asserted patent claims. *Id.* ¶ 39. The day after the Complaint was filed, however, Newegg received a letter from David Pridham of IP Nav on behalf of "[IP Nav's] client, Data Carriers" which referenced and attached the Complaint, stated without explanation that "the '198 patent is clearly practiced by Newegg, Inc.," and represented that "[i]t is [Data Carriers's] desire to avoid the need for protracted litigation, and they remain open to discussing a license to the '198 patent." *Id.* ¶ 36. Data Carriers has filed a total of 49 lawsuits asserting the patent-in-suit. *Id.* ¶¶ 41-45.

Data Carriers is a privately held LLC, and publicly available Delaware records fail to identify the ownership of Data Carriers. However, by tracing the chain of title of the patent-in-suit, it appears that Data Carriers is owned at least in part by Fielder Properties Management, LLC, which is in turn owned by an individual named Guy Fielder. *Id.* ¶ 32.

Guy Fielder has worked with IP Nav before in connection with another patent assertion company of his called The PACid Group, LLC. *Id.* ¶ 33. The arrangement with IP Nav in this

3

prior patent assertion campaign—which netted $22 million—was that "IP Nav would design, implement, and run a monetization campaign and structure its fee as a percentage of net proceeds." *Id.* ¶ 33. Curiously, TQP—the Spangenberg entity that separately sued Newegg discussed above—was previously named The PacID Group, LLC (identical to Guy Fielder's company except for the inverted capitalization of "PACid"), and it turns out that Guy Fielder's The PACid Group, LLC was created only 6 days after the Spangenberg company's name change to TQP. *Id.* ¶ 34. Because the precise arrangement of Data Carriers, its ownership, and its relationship with IP Nav are all non-public, discovery will be necessary to determine exactly what stake IP Nav and its principals have in, and to what extent they control, Data Carriers and the present litigation.

C.    The June 25, 2012 Auction Press Release

On June 25, 2012, IP Nav issued a press release announcing that it was holding an event on July 26, 2012 to auction off covenants not to sue various defendants of patent infringement litigations. Amended Counterclaim, ¶ 46. The auction centered around the defendants in various patent infringement lawsuits brought by "clients of IP Nav," including the SFA and TQP matters discussed above, as well as 24 lawsuits filed by Data Carriers on March 16, 2012. *Id.* The auction was billed as "an elegant and anonymous way to exit patent litigation quickly and in a cost effective way." *Id.* The press release explained that "[t]here are over 140 defendants in these litigations, yet only a handful of [covenants not to sue] will be available at auction." Newegg was expressly named in connection with the SFA and TQP matters in the press release, and so Newegg stood to benefit from the acquisition of a covenant not to be sued in those matters.

Because the press release was issued prior to Data Carriers' present Complaint being filed against Newegg, but the auction was scheduled to be held after Data Carriers' present

4

Complaint was filed, the auction did not *ostensibly* offer a covenant not to sue Newegg in connection with this present case because the public press release could not have listed a case that did not yet exist. Because Newegg is unable to identify any public source listing what covenants were actually up for auction on July 26, 2012, Newegg lacks information as to whether a covenant not to sue with respect to the present case was available.

      D.     IP Nav's Prior *Taurus IP* Litigation

The above-described pattern of conduct is not the first time that Erich Spangenberg and IP Nav have engaged in "questionable" business practices. *See Taurus IP, LLC v. DaimlerChrysler Corp.*, 559 F. Supp. 2d 947, 961 (W.D. Wis. 2008) (referring to "Spangenberg's practices" regarding one of his companies as "questionable"). The facts of the *Taurus* litigation are discussed in full in the court's opinion and portions thereof are summarized in Newegg's Amended Counterclaim at ¶¶ 48-50, which are briefly reiterated below.

In *Taurus*, the court explained that Erich Spangenberg was "employed by IP Navigation to act as a manger of limited liability companies that are, generally speaking, in the business of licensing and enforcing patents (but generally not in the business of practicing any of the inventions)." *Id.* at 953. The various limited liability companies ("LLCs") were indirectly owned by Erich Spangenberg's family. *Id.* The court observed that "Spangenberg has offered 'portfolio' settlement agreements" in litigation where the patents being licensed include those of multiple LLCs, even if an LLC's patent is unrelated to the litigation. *Id.* at 958. When such licenses were executed, the fees were not allocated to the companies based on the relative reasonable royalty rates for the patents, but were simply divided equally among the companies that are parties to the license. *Id.*

The *Taurus* litigation involved claims of infringement brought by one of Spangenberg's LLCs ("Orion IP, LLC, hereinafter "Orion") against defendants Chrysler and Mercedes-Benz. *Id.* at 955. Erich Spangenberg was the manager of Orion and authorized the lawsuit. *Id.* The case ultimately settled, and Orion represented in the settlement agreement that "it has not assigned or otherwise transferred to any other Person any rights to any causes of action, damages, or other remedies, or any Orion Patents, claims counterclaims or defenses, relating to the Litigation." *Id.* at 955-56. But prior to the execution of the settlement agreement one of the patents that had been asserted against Chrylser and Mercedes-Benz was serially assigned by Orion to Erich Spangenberg's other LLCs, ultimately ending up with one called Taurus IP, LLC. *Id.* at 956. Taurus IP then sued Chrysler and Mercedes-Benz again over the same patent. *Id.* In keeping with the "sue first, ask questions later" philosophy as applied to the above-discussed Newegg cases, "[b]efore filing the lawsuit, neither Orion, Taurus nor Spangenberg contacted Chrysler and Mercedes-Benz USA to explain why they believed defendants' public websites and computer systems infringed" the patent. *Id.* In prosecuting the case, Taurus took extensive and burdensome discovery of the defendants, including seeking orders compelling defendants' third party software vendors to disclose their source code. *Id.* at 957.

Ultimately, the jury returned a verdict in favor of Chrysler and Mercedes-Benz, finding that Orion had breached the warranty in the prior settlement agreement by assigning the patent to Taurus IP. *Id.* at 957. The defendants were awarded almost $4 million in damages, attorneys' fees, and costs to compensate the defendants for being compelled to assert a defense against the infringement claims that should never have been brought. *Id.* at 966.

E. Newegg's and IP Nav's Post-Filing Discussions

Data Carriers and IP Nav point out that instead of responding to their motions to dismiss Newegg's original counterclaim, Newegg opted to amend its counterclaim and moot the motions. Data Carriers and IP Nav assert that Newegg's Amended Counterclaim "includes wide-ranging, speculative allegations against IP Nav, non-party Erich Spangenberg, and, to a lesser extent, Data Carriers," and contends that Newegg failed to plead sufficient facts to support its claim. Data Carriers Br. at 5; IP Nav Br. at 1 FN 1 (joining Data Carriers' motion). To accuse Newegg of including mere "speculative" and insufficient allegations to support its counterclaim is incorrect, and ignores the fact and substance of post-filing communications that took place between the parties.[1]

In an effort initiated by IP Nav and purportedly intended to provide Newegg with information necessary to evaluate the merits of Newegg's claim against IP Nav, Newegg and IP Nav engaged in informal discussions following Newegg's originally filed abuse of process counterclaim. However, in the course of these discussions, IP Nav was evasive and either refused to answer direct questions or provided only vague and incomplete information. In particular, Newegg repeatedly asked what role IP Nav played in the selection of Newegg as a defendant among Data Carriers' 49 lawsuits, and how the decision to include Newegg as a defendant was made. Although Newegg was clear that this information was necessary to evaluate its counterclaim, IP Nav never meaningfully answered the questions. As a result, Newegg amended its pleadings to include additional publicly available information that further

---

[1] To the extent that some of these communications constituted or included information covered by Federal Rule of Evidence 408, Newegg has chosen not to attach the actual correspondence as exhibits to this brief. However, Newegg will provide the correspondence to the Court for *in camera* review should the Court deem it necessary.

bolsters its abuse of process counterclaim. While certain averments are necessarily made on information and belief, under these circumstances Newegg cannot fairly be accused of being "speculative." Newegg believes that the post-filing communications between IP Nav and Newegg give further credence to Newegg's averments that IP Nav influenced or controlled the decision to sue Newegg. Amended Counterclaim, at ¶¶ 34-35.

## II.    Argument

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Detailed factual allegations are not required—the claim must merely set forth the grounds for entitlement to relief and contain "more than labels and conclusions." *Bell Atlantic Corp.*, 550 U.S. at 555 ("[A] formulaic recitation of the elements of a cause of action will not do.").

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. As Data Carriers concedes, in making this determination "the court must accept the factual allegations of the non-moving party as true and draw all reasonable inferences in its favor." *Netgear, Inc. v. Ruckus Wireless, Inc.*, 852 F. Supp. 2d 470, 472 (D. Del. 2012); *see also* Data Carriers Br. at 6 (citing *Neitzke v. Williams*, 490 U.S. 319, 326 (1989)).

Newegg's abuse of process counterclaim against Data Carriers and IP Nav goes far above and beyond the kinds of "threadbare recitals of elements of a cause of action" and "mere conclusory statements" whereby dismissal might be proper. *Iqbal*, 556 U.S. at 678. Indeed, Newegg has provided the court with no fewer than 35 numbered paragraphs totaling 14 pages of

detailed facts and allegations providing the basis for Newegg's counterclaim.[2] All information reasonably available to Newegg has been set forth in the counterclaim and shows that it is highly plausible and likely that Data Carriers and IP Nav have abused the legal process in instituting this action and wielding the infringement complaint in the manner that they have. Newegg believes that the only reasonable conclusion to draw from the pleaded facts is that an abuse of process has been committed by Data Carriers and IP Nav.

### A. Abuse of Process Legal Principles

As a general matter, "[o]ne who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed, is subject to liability to the other for harm caused by the abuse of process." Restatement (Second) of Torts § 682 (1977). Under Delaware law, for an abuse of process claim to be viable, two elements must be met: "(1) an ulterior improper purpose; and (2) a willful act improperly used in the regular conduct of proceedings." *STMicroelectronics N.V. v. Agere Sys.*, No. 08C-09-099, 2009 Del. Super. LEXIS 184, at *11 (Del. Super. Ct. May 19, 2009); *Nix v. Sawyer*, 466 A.2d 407, 412 (Del. Super. Ct. 1983). "There must be '[s]ome definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of process.'" *Feinman v. Bank of Delaware*, 728 F. Supp. 1105, 1115 (D. Del. 1990) (citation omitted). The intent of the persons invoking the process is an important consideration in determining whether an improper purpose exists.

---

[2] In stark contrast, *GN Netcom, Inc. v. Callpod, Inc.*, relied on by Data Carriers, the defendant's abuse of process claim was dismissed not because its *theory* that bringing suit to gain leverage regarding other pending cases was legally deficient, but because its pleadings were insufficiently detailed to support a reasonable inference that the improper motive existed. 2012 U.S. Dist. LEXIS 132001, No. 11-cv-03271-RBJ, at *5 (D. Colo. Sept. 17, 2012) ("[T]he defendants have failed to identify how this complaint is being used improperly to create unfair leverage.").

*STMicroelectronics N.V.*, 2009 Del. Super. LEXIS 184, at 4 ("Such issues are difficult to resolve prior to discovery.").

An abuse of process may occur upon the commencement of a valid lawsuit to coerce the payment of an unrelated debt. *Toll Bros., Inc. v. General Acc. Ins. Co.*, No. 98C-08-203, 1999 Del. Super. LEXIS 313, at *15 (Del. Super. Ct. Aug. 4, 1999) ("The quintessential case of abuse of process is the initiation of a valid law suit to compel the payment of a debt unrelated to the suit (a collateral purpose) and an offer to terminate such litigation upon payment of the unrelated debt."). The improper purpose in an abuse of process claim is usually to obtain a collateral advantage against the opposing party. *Id.*; *Nix*, 466 A.2d at 412. Moreover, "there must be some type of coercion involved, 'such as the ... [demand of] payment of money, by the [improper] use of process as a threat or club' to obtain a collateral advantage." *Feinman*, 728 F. Supp. at 1115; *Nix*, 466 A.2d at 412.

Abuse of process claims come in many different forms, including coercing one to take some action or refrain from a specific action. *See* Restatement (Second) of Torts § 682, cmt. a (1977) ("The gravamen of [an abuse of process claim] . . . is the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish. [I]t is immaterial that the process was properly issued, that it was obtained in the course of proceedings that were brought with probable cause and for a proper purpose, or even that the proceedings terminated in favor of the person instituting or initiating them."). One such example of an abuse of process is the use of the legal process to leverage a nuisance settlement. Unlike in an ordinary settlement context, "a so-called nuisance settlement . . . is not just one that is entered into after the usual economic calculation: It is one that is accepted . . . solely in an effort to avoid the expense of litigation"—i.e., regardless of the merits of the case. *Tyler v. Corner*

*Const. Corp.,* 167 F.3d 1202, 1206 (8th Cir. 1999). "Suits that are frivolous or groundless are true nuisances; indeed, they are sometimes thinly disguised forms of extortion, the kinds of activities that courts ought, for obvious reasons, not to encourage." *Id.* Often a plaintiff will fail to even investigate the facts of the situation at hand before filing a suit and may even neglect to obtain essential expert evidence. *See Eon-Net LP v. Flagstar Bancorp,* 653 F.3d 1314, 1328 (Fed. Cir. 2011) (holding that the district court did not clearly err when it found that plaintiff had filed an objectively baseless infringement action against the defendant, specifically to extract a nuisance value settlement by exploiting the high cost imposed on defendant to defend against the lawsuit); *see also Bull v. McCuskey,* 615 P.2d 957, 960 (Nev. 1980) (finding an abuse of process where a plaintiff sought a nuisance settlement after suing a doctor for malpractice, where the plaintiff failed to adequately investigate before filing the suit, lacked any essential expert evidence, and offered to settle the case for the minimal sum of $750.).

B.     The Agency Relationship Between IP Nav and Data Carriers is Such That They are Jointly and Severally Liable for the Abuse of Process, and Any Knowledge and Improper Intent on the Part of IP Nav is Imputed to Data Carriers

A special relationship exists between a principal and its agent, and has certain implications for the liability of an agent's actions. "It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment." *Meyer v. Holley,* 537 U.S. 280, 285 (2003). Therefore, "if the principal is the master of an agent who is a servant, the fault of the agent, if acting within the scope of employment, will be imputed to the principal by the doctrine of *respondeat superior.*" *ING Bank, FSB v. American Reporting Co., LLC,* 843 F. Supp. 2d 491, 494 (D. Del. 2012). Vicarious liability is not the sole liability that may be imputed among principals and agents, however. "[A]n employer's liability under *respondeat superior* is not

11

mutually exclusive of an individual employee's joint and several liability. At common law, a court could hold an employer and employee jointly and severally liable for the employee's wrongful conduct." *Wyss v. General Dynamics Corp.*, 24 F. Supp. 2d 202, 211 (D.R.I. 1998); *Tomka v. Seiler Corp.*, 66 F3d 1295, 1320 (2d Cir. 1995).

The principal is liable for an agent's action committed within the scope of his or her employment, even if the principal did not possess the requisite knowledge or intent that the agent possessed. *Am. Int'l Group, Inc. v. Greenberg*, 965 A.2d 763, 806 (Del. Ch. 2009) ("[T]he knowledge of an agent is normally imputed to the agent's principal."). Quite often "[t]he principal is liable for the acts and negligence of the agent in the course of his employment, although he did not authorize or did not know of the acts complained of." *New Orleans, M., & C. R. Co. v. Hanning*, 82 U.S. 649, 657 (1872) (cited in *Meyer*, 537 U.S. at 286). "[T]he general rule is that an agent's knowledge is imputed to the principal where that knowledge, 'pertain[s] to the duties of the agent, the subject matter of his employment and [does] not affect matters outside the scope of his employment.'" *Lang v. Koziarz*, No. 1120-SUSSEX, 1989 Del. Ch. LEXIS 44, at *3-4 (Del. Ch. May 2, 1989) (citing *Vechery v. Hartford Accident & Indemnity Ins. Co.*, 121 A.2d 681, 684 (Del. 1956)). Additionally, the agent's *intent* can be imputed to the principal where the agent acts intentionally to harm a third party and the principal has actual or imputed knowledge of the agent's actions. *KE Property Management, Inc. v. 275 Madison Management Corp.*, No. 12683, 1993 Del. Ch. LEXIS 147, at *18-19 (Del. Ch. July 21, 1993).

It is beyond question that IP Nav is Data Carriers' agent at least for purposes of monetizing Data Carriers' patent in the present litigation and licensing campaign. Amended Counterclaim, ¶ 36; *see also* Ex. E, at ¶ 5 ("IPNav acts as an independent contractor providing strategic advisory services to Data Carriers relating to, among other things, the acquisition, sale,

12

and licensing of Data Carriers' intellectual property."). Public sources do not reveal the precise arrangement of the agency relationship between Data Carriers and IP Nav, and IP Nav has evaded direct questions on the subject, but based on prior relationships with Data Carriers' ultimate owner, Guy Fielder, Newegg believes and avers that their arrangement is such that "IP Nav would design, implement, and run a monetization campaign [for Data Carriers' patents] and structure its fee as a percentage of net proceeds." Amended Counterclaim, ¶¶ 32-35. The monetization campaign for which IP Nav has been retained thus far appears to include 49 separate lawsuits, including the one asserted against Newegg. *Id.* ¶¶ 41-45. Newegg believes that IP Nav possessed the intent to achieve improper collateral objectives by including Newegg as a defendant—including coercing Newegg to settle other matters regarding patents that are being monetized by IP Nav, whether directly or via participation in the auction of covenants not to sue. *Id.* ¶¶ 27, 29, 46, 47, 51. Because IP Nav stood to gain from any such settlements, Newegg believes that IP Nav either made or heavily influenced the decision that Newegg be among these defendants so as to obtain these collateral objectives. *Id.* ¶ 35. Thus, IP Nav is properly joined as a defendant in Newegg's abuse of process counterclaim and is jointly and severally liable to Newegg along with Data Carriers to the full extent that IP Nav has been involved in the selection of Newegg as a defendant, the filing of the complaint, the present litigation, the related litigations, the license offer, and the auction. Amended Complaint, ¶ 53.

IP Nav relies heavily on *Wooleyhan v. Cape Henlopen Bd. of Educ.,* No. 10-0153, 2010 U.S. Dist. LEXIS 65060, at *18-19 (D. Del. June 28, 2010) and *TruePosition, Inc. v. Allen Telecom,* No. 01-823 GMS, 2003 U.S. Dist. LEXIS 881, at *21 (D. Del. Jan. 21, 2003) for the proposition that an abuse of process claim may only ever be brought against the named plaintiff in an action. IP Nav Br. at 2. Despite cherry-picked language in these cases referring to an

investigation into the "intent of the persons invoking the process" or considering whether the "plaintiff had an ulterior purpose," whether a person other than the named plaintiff could be jointly and severally liable along with the named plaintiff was not considered—let alone decided—by the court in either case. IP Nav is Data Carriers's agent in this patent monetization and litigation campaign and is the entity that Newegg alleges is largely responsible for the decision to file the complaint against Newegg and wield it in the manner that constitutes an abuse of process. As such, IP Nav is jointly and severally liable with Data Carriers for this abuse of process and cannot shield itself from liability merely because it is not the owner of the patent and a named plaintiff in the infringement action.

C. Data Carriers has no "Absolute Right" to File a Patent Infringement Lawsuit where the Lawsuit is Filed and Wielded for Improper Collateral Advantages

Data Carriers' motion hinges on the erroneous notion that it has an "absolute right" to sue Newegg for patent infringement. Data Carriers Br. at 4. If this were an accurate characterization of the law, no claim for abuse of process could ever be brought in a patent infringement case.

Data Carriers relies heavily on *Bayer AG v. Sony Elecs., Inc.* for the proposition that a patentee "is entitled to pursue litigation to defend its patent." 229 F. Supp. 2d 332, 368-69 (D. Del. 2002). Data Carriers also harps on the court's mentioning that "the pursuit of settlement is a valid, legitimate, and worthy part of the process." *Id.*; Data Carriers Br. at 2, 4, 7. But Data Carriers ignores the fact that in *Bayer* the lawsuit was filed *after* settlement discussions were pursued and resulted in an impasse. *See Bayer AG*, 229 F. Supp. 2d at 368-69 ("That Bayer tried to settle this action with [the Defendant] *prior to filing suit* cannot be construed as form of extortion.") (emphasis added). While any infringement accusation always has a coercive effect to cause a defendant to consider licensing or settlement, where, as here, Newegg was sued first

14

and then contacted by IP Nav with an invitation to engage in licensing discussions (recall Spangenberg's mantra, "sue first, ask questions later"), the proceedings are of an especially coercive character. Once the lawsuit was filed, Newegg was "on the hook" and had no choice but to cooperate and negotiate with Data Carriers and IP Nav if it wanted to avoid having to incur the cost and burden of defending the case. Unlike *Bayer*, this fundamental difference makes the situation highly coercive and "can[] be construed as a form of extortion." *Id.*

The extortion and improper seeking of a collateral advantage stems not only from the filing of the complaint to get Newegg on the hook, but is also evidenced by how Data Carriers and IP Nav "wielded" the complaint once it was filed. Amended Counterclaim, ¶¶ 47, 51. While Data Carriers posits that "the filing of a complaint has categorically been found to not be an abuse of process," *see* Data Carriers Br. at 8 (citing *RRR Farms, LTD v. Am. Horse Protection Ass'n, Inc.*, 957 S.W.2d 121, 134 (Tex. App. 1997) ("[F]iling a complaint is not an improper or illegal use of process.")), it is clearly the "improper use of the process after its issuance" that properly forms the basis of Newegg's counterclaim. *RRR Farms*, 957 S.W.2d at 134; *Spence v. Spence*, No. K11C-06-035, 2012 Del. Super. LEXIS 188, at *10 (Del. Super. Ct. April 20, 2012) ("[A]buse of process is concerned with a perversion of the process *after* it is issued."). Here, Data Carriers and IP Nav engaged in post-filing conduct that is undoubtedly a "perversion of the process." *Id.*; *RRR Farms*, 957 S.W.2d at 134.

The various attempts to use the complaint to obtain collateral advantages that are summarized by Newegg in paragraph 51 of its Amendment Counterclaim are all abuses of the filed complaint that were lacking in *Bayer*. Given Newegg's history in dealing with IP Nav and its "clients" SFA and TQP, receiving a licensing offer letter from IP Nav immediately *after* being

sued by Data Carriers is a highly coercive action that has in the past resulted in what Newegg views as unreasonable settlement demands followed by highly expensive and burdensome litigation from which Newegg cannot unilaterally extricate itself. Amended Complaint, ¶ 36. This letter carries an especially coercive subtext based on Newegg's experience dealing with IP Nav's "clients," and based on its knowledge of the prior experiences of others. *See, e.g., Taurus IP*, 559 F. Supp. 2d at 959, 958 (noting Erich Spangenberg's "willingness to sue . . . Defendants over and over" and enforce patents against the same defendants "when he has the capability of doing so") (quoting *ST Sales Tech Holdings, LLC v. Daimler Chrysler Co., LLC*, No. 6:07-cv-00346-LED-LJD, 2008 U.S. Dist. LEXIS 107096, at \*20, 27-29 (E.D. Tex. March 14, 2008)

Thus far, Data Carriers and IP Nav have expressed no interest in learning more about the technical operations of Newegg's website and the accused "autocomplete" feature, but are ostensibly just seeking a monetary discussion that will result in Newegg agreeing to pay a nuisance value settlement amount. Amended Counterclaim, at ¶¶ 39, 40, 45, 51. Given the co-pending *SFA* and *TQP* cases involving IP Nav, which Newegg has refused to settle on terms it deems unreasonable, including Newegg among the Data Carriers defendants can only serve to place additional heavy litigation burdens on Newegg. *Id.* ¶¶ 29-30. Newegg believes that this was a—if not *the*—motivating factor in the selection of Newegg as a defendant in this case, and that IP Nav decided or helped to decide that Newegg should be sued for this purpose since IP Nav stands to gain from any settlement of the *SFA* and *TQP* matters, whether through direct negotiation or an auction. *Id.* ¶¶ 27, 29, 46, 47, 51.

Regarding the auction, much is made by Data Carriers and IP Nav of the fact that a covenant not to sue was not ostensibly up for auction as to the present case between Data

16

Carriers and Newegg. Data Carriers Br. at 2, 4, 8; IP Nav Br. at 1, 3. This is largely irrelevant, since covenants not to sue Newegg as to the *SFA* and *TQP* matters were up for auction and IP Nav, which apparently obtains compensation for all licenses and settlements,[3] stood to gain by Newegg bidding on those covenants. Amended Counterclaim, at ¶¶ 33, 35, 46. Data Carriers suggests that the absence of a covenant in the present case means that Data Carriers would gain no advantage in the auction by suing Newegg. This is simply not true. The instant suit was likely intended—at least in part—to drive Newegg to bid on one of the "handful" of covenants available. If Newegg were to appear and/or bid on *any* covenant, including one relating to SFA or TQP, it could drive up the price of the few available covenants at auction, resulting in a higher price for Data Carriers as to the covenants that remained available. *Id.* ¶ 46.

Further, as explained above, due to the timing of the press release, complaint, and subsequent auction, a covenant not to sue Newegg in the present case could not have been announced by the June 25, 2012 press release because the complaint had not yet been filed against Newegg at that time. Yet no public documents verify that a covenant regarding this case was *not* up for auction, which is why Newegg avers only that "the auction did not *ostensibly* offer a covenant not to sue Newegg in connection with this present case." Amended Counterclaim, at ¶ 46 (emphasis added). Newegg has not, as Data Carriers and IP Nav allege, conceded that the auction did not include a covenant not to sue Newegg in this case. Newegg has seen no evidence to suggest that such a covenant was not available for this case; and to the extent that it was available, the advantage to Data Carriers and the coerciveness of the present complaint to cause Newegg to attend the auction becomes even more compelling. Data Carriers

---

[3] IP Nav's website makes clear that "[i]f we don't make money for you, we don't get paid." http://www.ipnav.com/what-we-do/compare-alternatives/ (last visited December 4, 2012).

makes the absurd argument that even if the auction did offer a covenant with respect to this case, that would present a "disadvantage" to Data Carriers "in that Data Carriers would be releasing its claims against Newegg." Data Carriers Br. at 9. Data Carriers appears to have overlooked that in its auction the covenant would be granted in exchange for a substantial sum of money.

Thus, using the present complaint to coerce Newegg to participate in the auction could only help to improve the auction's turnout and financial result for both Data Carriers and IP Nav. *Id.* ¶ 47, 51. Promising a "cost effective" litigation avoidance to the highest bidder may not literally "force" Newegg to attend, but it undoubtedly creates a highly coercive environment given the immense cost and burden of defending litigation. Data Carriers Br. at 8-9. When this Court said in *Bayer* that "the pursuit of settlement is a valid, legitimate, and worthy part of the process," it is doubtful that the Court had in mind an auction of covenants not to sue, offered to dozens of defendants in pending cases but given only to a few of the highest bidders. 229 F. Supp. 2d 322, 368-69 (D. Del. 2002). The facts of *Bayer* involved pre-suit direct party-to-party negotiations to avoid litigation. The auction is, rather, "a perversion of the process." *Spence,* 2012 Del. Super. LEXIS 188, at *10; *accord* Amended Counterclaim, at ¶ 47 ("[T]his auction constitutes a perverse abuse of the American justice system.").

Unlike in *Bayer,* Data Carriers and IP Nav did not simply file a complaint and do "nothing more than carry out the process to its authorized conclusion." *Bayer,* 229 F. Supp. 2d at 368. Data Carriers and IP Nav have no absolute right to file a complaint against Newegg and wield that complaint in a manner that is improper in the normal course of proceedings, and which seeks to coerce a nuisance settlement, to draw attention to and coerce Newegg to attend

and participate in an auction, to add to its auction inventory, and/or to coerce a settlement in other pending matters. Amended Complaint, ¶ 51; *Nix,* 466 A.2d at 412; *Bull,* 615 P.2d at 960.

D.     Newegg has Requested Relief as to IP Nav in Satisfaction of Rule 8(a)(3)

IP Nav contends that Newegg failed to seek any relief whatsoever from IP Nav in its prayer for relief, and that Newegg's abuse of process counterclaim must therefore be dismissed as to IP Nav under Federal Rule of Civil Procedure 8(a)(3). However, Newegg's prayer for relief specifically requests that judgment be entered against both "Data Carriers and IP Navigation Group," and asks for relief from IP Nav in at least three separate paragraphs: F, G, and H. *See* Amended Counterclaim, at pp. 22-23.

While the particular form and extent of the harm to Newegg is difficult to quantify at this early stage, one way that Newegg is harmed is by having to defend against this action that has been brought for improper and collateral purposes. Thus, paragraph F seeks from both Data Carriers and IP Nav "reasonable attorney's fees pursuant to 35 U.S.C. § 285 and other applicable statutes, rules, and law." Contrary to IP Nav's assertion, this is not limited to attorneys' fees under 35 U.S.C. § 285 relating to the patent infringement action, but on its face broadly includes fees that can be awarded under "other applicable statutes, rules, and law."

Given the patent assignments and re-assertion of the same patents by Erich Spangenberg and IP Nav that took place in the *Taurus IP* litigation, Newegg requested injunctive relief in paragraph G to prevent Data Carriers and IP Nav from assigning the patent-in-suit to another entity and again suing Newegg. Paragraph G requests that Data Carriers and its "agents . . . [and] representatives, and any successors or assigns thereof . . . [be enjoined] from charging or asserting infringement of any claim of [the patent-in-suit] against Newegg." On its face this paragraph includes relief from IP Nav as Data Carriers' agent and representative.

19

Finally, paragraph H requests from both Data Carriers and IP Nav "such other and additional relief as the Court may deem just and proper." Given the difficulty of quantifying Newegg's harm at this time, such relief might include, for example and without limitation, any harm or expense that is caused by the added burden of having to defend the Data Carriers case, or any settlement amounts paid by Newegg to *SFA* or *TQP* due to this added burden.

E.    At a Minimum, Discovery is Necessary and Appropriate on the Abuse of Process Claim

The intent of those alleged to have abused the process is an important consideration in determining whether an improper purpose exists, but "[s]uch issues are difficult to resolve prior to discovery." *STMicroelectronics N.V.*, 2009 Del. Super. LEXIS 184, at *4. Much of Newegg's claim hinges on the alleged intent and knowledge of IP Nav and Data Carriers, which are currently pleaded on information and belief, and based only on the circumstantial evidence that is presently known to Newegg and available from public sources. Amended Complaint, at ¶ 51. The inherent challenges of directly proving intent coupled with IP Nav's unwillingness to be forthcoming in its involvement in making decisions regarding this case make discovery necessary and appropriate to further probe at least these aspects of the counterclaim.

## CONCLUSION

For the foregoing reasons, Data Carriers' and IP Nav's motions to dismiss Newegg's abuse of process counterclaim should be denied in full.

20

PROCTOR HEYMAN LLP

/s/ Dominick T. Gattuso
Dominick T. Gattuso (# 3630)
E-mail:  dgattuso@proctorheyman.com
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300

*Attorneys for Defendant Newegg Inc.*

OF COUNSEL:

THE WEBB LAW FIRM
Kent E. Baldauf, Jr.
E-mail: KBaldaufjr@webblaw.com
Bryan P. Clark
E-mail: BClark@webblaw.com
Daniel H. Brean
E-mail: DBrean@webblaw.com
One Gateway Center
420 Ft. Duquesne Boulevard, Suite 1200
Pittsburgh, PA 15222
(412) 471-8815

Dated:  December 17, 2012